69 U.S. 135 (1864)
2 Wall. 135
THE CIRCASSIAN.
Supreme Court of United States.

*142 Messrs. A.F. Smith and Larocque, for the claimants of the ship and cargo.
Mr. Eames, contra, for the captors.
*148 The CHIEF JUSTICE delivered the opinion of the court.
That the rebellion against the national Government, which, in April, 1861, took the form of assault on Fort Sumter, had, before the end of July, assumed the character and proportions of civil war; and that the blockade, established under the President's proclamation, affected all neutral commerce, from that time, at least, with its obligations and liabilities, are propositions which, in this court, are no longer open to question. They were not more explicitly affirmed by the judges who concurred in the judgment pronounced in the prize cases at the December Term, 1862, than by the judges who dissented from it.
The Government of the United States, involved in civil war, claimed the right to close, against all commerce, its own ports seized by the rebels, as a just and proper exercise of power for the suppression of attempted revolution. It insisted, and yet insists, that no one could justly complain if that power should be decisively and peremptorily exerted. In deference, however, to the views of the principal commercial nations, this right was waived, and a commercial blockade established. It was expected that this blockade, effectively maintained, would be scrupulously respected by nations and individuals who declared themselves neutral.
*149 Of the various propositions asserted and controverted in the discussion of the cause now under consideration, two only need be examined in order to a correct understanding of its merits. It is insisted for the captors,
1. That on the 4th of May, 1862, the port of New Orleans was under blockade;
2. That the Circassian, with a cargo destined for New Orleans, was then sailing with intent to violate that blockade, and therefore liable to capture as naval prize.
Both propositions are denied by the claimants. We shall consider them in their order.
First, then, was the port of New Orleans under blockade at the time of the capture?
The city of New Orleans, and the forts commanding its approaches from the Gulf, were captured during the last days of April, 1862, and military possession of the city was taken on the 1st of May. Did this capture of the forts and military occupation of the city terminate the blockade of the port?
The object of blockade is to destroy the commerce of the enemy, and cripple his resources by arresting the import of supplies and the export of products. It may be made effectual by batteries ashore as well as by ships afloat. In the case of an inland port, the most effective blockade would be maintained by batteries commanding the river or inlet by which it may be approached, supported by a naval force sufficient to warn off innocent, and capture offending vessels attempting to enter.
The capture of the forts, then, did not terminate the blockade of New Orleans, but, on the contrary, made it more complete and absolute.
Was it terminated by the military occupation of the city?
The blockade of the ports of the insurgent States was declared from the first by the American Government to be a blockade of the whole coast, and so it has been understood by all governments. The blockade of New Orleans was a part of this general blockade. It applied not to the city alone, but controlled the port, which includes the whole *150 parish of Orleans, and lies on both sides of the Mississippi, and all the ports on that river and on the lakes east of the city.
Now, it may be well enough conceded that a continuous and complete possession of the city and the port, and of the approaches from the Gulf, would make a blockade unnecessary, and would supersede it. But, at the time of the capture of the Circassian, there had been no such possession. Only the city was occupied, not the port, much less the district of country commercially dependent upon it, and blockaded by its blockade. Even the city had been occupied only three days. It was yet hostile; the rebel army was in the neighborhood; the occupation, limited and recent, was subject to all the vicissitudes of war. Such an occupation could not at once, of itself, supersede or suspend the blockade. It might ripen into a possession which would have that effect, and it did; but at the time of the capture it operated only in aid and completion of the naval investment.
There is a distinction between simple and public blockades which supports this conclusion. A simple blockade may be established by a naval officer, acting upon his own discretion or under direction of superiors, without governmental notification; while a public blockade is not only established in fact, but is notified, by the government directing it, to other governments. In the case of a simple blockade, the captors are bound to prove its existence at the time of capture; while in the case of a public blockade, the claimants are held to proof of discontinuance in order to protect themselves from the penalties of attempted violation. The blockade of the rebel ports was and is of the latter sort. It was legally established and regularly notified by the American Government to the neutral governments. Of such a blockade, it was well observed by Sir William Scott: "It must be conceived to exist till the revocation of it is actually notified." The blockade of the rebel ports, therefore, must be presumed to have continued until notification of discontinuance.[*]
*151 It is, indeed, the duty of the belligerent government to give prompt notice; and if it fails to do so, proof of discontinuance may be otherwise made; but, subject to just responsibility to other nations, it must judge for itself when it can dispense with blockade. It must decide when the object of blockade, namely, prevention of commerce with enemies, can be attained by military force, or, when the enemies are rebels, by military force and municipal law, without the aid of a blockading force. The Government of the United States acted on these views. Upon advice of the capture of New Orleans, it decided that the blockade of the port might be safely dispensed with, except as to contraband of war, from and after the 1st of June. The President, therefore, on the 12th of May, issued his proclamation to that effect, and its terms were undoubtedly notified to neutral powers. This action of the Government must, under the circumstances of this case, be held to be conclusive evidence that the blockade of New Orleans was not terminated by military occupation on the 4th of May. New Orleans, therefore, was under blockade when the Circassian was captured.
It remains to be considered whether the ship and cargo were then liable to capture as prize for attempted violation of that blockade.
It is a well-established principle of prize law, as administered by the courts, both of the United States and Great Britain, that sailing from a neutral port with intent to enter a blockaded port, and with knowledge of the existence of the blockade, subjects the vessel and, in most cases, its cargo to capture and condemnation.[*] We are entirely satisfied with this rule. It was established, with some hesitation, when sailing vessels were the only vehicles of ocean commerce; but now, when steam and electricity have made all nations neighbors, and blockade running from neutral ports seems to have been organized as a business, *152 and almost raised to a profession, it is clearly seen to be indispensable to the efficient exercise of belligerent rights. It is not likely to be abandoned until the nations, by treaty, shall consent to abolish capture of private property on the seas, and with it the whole law and practice of commercial blockade.
Do the Circassian and her cargo come within this rule?
The Circassian was chartered at Paris on the 11th of February, 1862, by Z.C. Pearson & Co. to J. Soubry, agent, and the charter-party contained a stipulation that she should proceed to Havre or Bordeaux, and, being loaded, proceed thence with her cargo to Havana, Nassau, or Bermuda, and thence to a port in America and "run the blockade, if so ordered by the freighters." With this charter-party was found on the ship, at the time of capture, a memorandum of affreightment given to Bouvet, one of the shippers, and signed "For account and with authority of J. Soubry,  Laibert, Neveu," and containing this engagement: "Mr. J. Soubry engages to execute the charter-party of affreightment; that is to say, that the merchandise shall not be disembarked except at New Orleans, and to this effect he engages to force the blockade." With this paper was the following note, signed "P. Desbordes:" "Sent similar memorandum to the parties concerned." This P. Desbordes was the ship's husband or agent at Bordeaux.
It is urged, on behalf of the claimants, that there is no evidence that Laibert had authority to act for Soubry; but the fact that the paper was found on the ship raises a presumption that he had that authority, and puts the burden of proof to the contrary on the claimants. Besides, it appears, from a letter written by Bouvet, that he forwarded by the ship, inclosed with this letter, the bills of lading of the goods shipped by him, and also "a copy of the charter-party and private memorandum." It can hardly be doubted that the copy of the charter-party in the record is this copy forwarded by Bouvet, or that the memorandum found with it is the private memorandum of which he writes. The circumstance that a similar memorandum was sent to the parties concerned *153 raises an almost irresistible presumption that the other freighters shipped their merchandise under the same express stipulation to force the blockade.
It is hardly necessary to go further on the question of intent; but if doubt remained, it would be dispelled by an examination of the other papers and facts in the case. Every bill of lading contained a stipulation for the conveyance of goods described in it to Havana, in order to receive orders as to their ulterior destination, and for their delivery at that destination on payment of freight. Such, we think, is the true import of each bill before us. Almost every letter found on board the ship and contained in the record, affords evidence of intent to force the blockade. These letters were written, at Bordeaux, to correspondents at Havana and New Orleans, and speak of the steamer as "loaded entirely with our products for New Orleans;" as "arrived hither a month since, to convey to your place, New Orleans, by forcing the blockade, a very fine cargo;" as "loaded in our port for New Orleans, whither she will proceed after touching at Havana;" as "being a very fast sailer;" as "going to attempt the entrance of your river, after previously touching at Havana;" as "bound to your port, New Orleans;" as "bound from Bordeaux to New Orleans;" and as "having engaged to force the blockade." Most of these letters were written by shippers, and relate to merchandise described in one or another of the bills of lading. Finally, it is proved that on the eve, and almost at the moment, of capture, the captain ordered the destruction of a package of letters put on board the ship, after she had cleared from Bordeaux, at Panillac, a town on the Gironde, nearer the sea. These letters, doubtless, related to the ship, the cargo, or the voyage, probably to all. Their destruction would be a strong circumstance against the ship and cargo, were the other facts less convincing; taken in connection with them, it irresistibly compels belief of guilty intent at the time of sailing and time of capture.
It was urged in argument that the ship was bound primarily to Havana, and might discharge her cargo there, and *154 should not be held liable to capture for an intent which would have been abandoned on her arrival at that place.
We agree, that if the ship had been going to Havana with an honest intent to ascertain whether the blockade of New Orleans yet remained in force, and with no design to proceed further if such should prove to be the case, neither ship nor cargo would have been subject to lawful seizure. But it is manifest that such was not the intent. The existence of the blockade was known at the inception of the voyage, and its discontinuance was not expected. The vessel was chartered and her cargo shipped with the purpose of forcing the blockade. The destination to Havana was merely colorable. It proves nothing beyond a mere purpose to touch at that port, perhaps, and, probably, with the expectation of getting information which would facilitate the success of the unlawful undertaking. It is quite possible that Havana, under the circumstances, would have turned out to be, as was insisted in argument, a locus penitenti; but a place for repentance does not prove repentance before the place is reached. It is quite possible that the news which would have met the vessel at Havana would have induced the master and shippers to abandon their design to force the blockade by ascending the Mississippi; but future possibilities cannot change present conditions. Nor is it at all certain that the purpose to break the blockade would have been abandoned. On the contrary, it is quite possible that the "ulterior destination" mentioned in the bills of lading would have been changed to some other blockaded port. But this is not important. Neither possibilities nor probabilities could change the actual intention one way or another. At the time of capture, ship and cargo were on their way to New Orleans, under contract that the cargo should be discharged there and not elsewhere, and that the blockade should be forced in order to the fulfilment of that contract. This condition made ship and cargo then and there lawful prize.
There was some attempt, in argument, to distinguish that portion of the cargo shipped by William Burrows from the *155 remainder. We do not think it can be so distinguished. The bill of lading of the goods shipped by him is expressed in the same terms as the bills of goods shipped by others, and Burrows himself states that he received it from P. Desbordes & Co.,  the same Desbordes who sent "to the other parties" memorandums similar to that which was given to Bouvet, and which stipulated for breach of blockade. There is no indication in the bill of lading that any one except Burrows had any interest in these goods, and no testimony except his own to that effect. Against the strong circumstances which tend to prove that they were in equal fault with all the rest, his not very unequivocal statement, that they were destined for sale in Havana, cannot prevail.
The decree of the District Court, condemning the vessel and cargo as lawful prize, must be
AFFIRMED.
Mr. Justice NELSON, dissenting:
I am unable to concur in the judgment of the court in this case; and shall proceed to state briefly the grounds of my dissent, without entering upon the argument or discussion in support of them.
I think the proof sufficient to show, that the purpose of the master was to break the blockade of the port of New Orleans, and that it existed from the inception of the voyage: but, in my judgment, the defect in the case, on the part of the captors, is that no blockade existed at the port of New Orleans at the time the seizure was made. The city was reduced to possession by the naval forces of the United States, on the 25th of April preceding the seizure, and Forts Jackson and St. Philip on the 23d of the same month. They were situated on the opposite banks of the Mississippi River, about one-third of the way up to the city from its mouth. Admiral Farragut announced to the Government the capture and possession of the city on the day it took place, 25th of April, and General Butler, of the capture of the forts on the 29th. The latter announced, that the enemy had abandoned all their defensive works in and around New Orleans, including Forts Pike and Wood, on Lake Pontchartrain, *156 and Fort Livingston on Barataria Bay; and had abandoned everything up the river as far as Donaldsville, some seventy miles beyond New Orleans. The authority of the Government of the United States had been restored over the city and its inhabitants; and over the Mississippi River, and both of its banks and the inlets to the same, from the ocean or gulf, including, also, the passage for vessels by the way of Lakes Borgne and Pontchartrain, the usual channel for vessels engaged in the coasting trade to and from New Orleans. And on the 1st of May, General Butler announced by proclamation, that the city of New Orleans and its environs, with all its interior and exterior defences, having surrendered to the combined land and naval forces of the United States, and being now in the occupation of these forces, the Major-General commanding hereby proclaims the objects and purposes of the United States in thus taking possession, &c., and the rules and regulations by which the laws of the United States would be, for the present, and during the state of war, enforced and maintained. The seizure of the vessel and cargo was made between Matanzas and Havana, on the 4th of May, several days after the city and port of New Orleans were reduced, and full authority of the United States extended and held over them.
A blockade under the law of nations is a belligerent right, and its establishment an act of war upon the nation whose port is blockaded. One of the most important of the belligerent rights is that of blockading the enemy's ports, not merely to compel the surrender of the place actually attacked or invested, but, as a means, often the most effectual, of compelling the enemy, by the pressure upon his financial and commercial resources, to listen to terms of peace. The object of a blockade, says Chancellor Kent, is not merely to prevent the importation of supplies, but to prevent export as well as import, and to cut off all communication of commerce with the blockaded port.
Now, the capture and possession of the port of the enemy by the blockading force, or by the forces of the belligerent, in the course of the prosecution of the war, puts an end to *157 the blockade and all the penal consequences growing out of this measure to neutral commerce. The altered condition of things, and state of the war between the two parties in respect to the besieged port or town, makes the continuance of the blockade inconsistent with the code of international law on the subject; as no right exists on the part of the belligerent as against the neutral powers to blockade his own ports. This principle was recognized and applied by Sir W. Scott in the case of The Trende Soztre, decided in 1807.[*] She was a Danish vessel and was on a voyage to the Cape of Good Hope, then the port of an enemy, with contraband articles on board, and was seized as a prize of war; but the vessel had arrived at the Cape after that settlement had surrendered to the British forces. The counsel for the captors insisted, that though the settlement had become British, the penalty would not be defeated, as the intention and the act continued the same; that there was no case in which such a distinction had been allowed on the question of contraband. "The distinction," it was remarked, "which had been admitted in blockade cases, stood altogether on particular grounds, as arising out of a class of cases depending on the blockade of neutral ports, in which the court had expressed a disposition to admit all favorable distinctions." The court, in delivering its opinion, observes: "If the port had continued Dutch, a person could not have been at liberty to carry thither articles of a contraband nature, under an intention of selling other innocent commodities only, and of proceeding with the contraband articles to a port of ulterior destination. But before the ship arrives, a circumstance takes place which completely discharges the whole of the guilt. Because, from the moment when the Cape became a British possession, the goods lost their nature of contraband. They were going into the possession of a British settlement; and the consequence of any pre-emption that could be put upon them, would be British pre-emption." The court also observed: "It has been said, that this is a *158 principle which the court has not applied to cases of contraband; and that the court, in applying it to cases of blockade, did it only in consideration of the particular hardships consequent on that class of cases. But I am not aware of any material distinction; because the principle on which the court proceeded was, that there must be a delictum existing at the moment of the seizure to sustain the penalty." "I am of opinion, therefore," the judge says, in conclusion, "that the same rule does apply to cases of contraband, and upon the same principle on which it has been applied in those of blockade." See also the case of The Lisette,[*] and of The Abby,[] in which the same principle is declared, and one of them a case of blockade.
The cessation of the blockade necessarily resulted from the capture and possession of the port and town of New Orleans. They no longer belonged to the enemy, nor were under its dominion, but were a port and town of the United States. They had become emphatically so, for the capture was not that of the territory of a foreign nation to which we had obtained only the right and title of a conqueror; but the conquest was over our own territory, and over our own people, who had by illegal combinations, and mere force and violence, subverted the laws and usurped the authority of the General Government. The capture was but the restoration of the ancient possession, authority, and laws of the country, the continuance and permanency of which, so far as the right is involved, depend not on conquest, nor on the success or vicissitudes of armies; but upon the Constitution of the United States, which extends over every portion of the Union, and is the supreme law of the land. The doubt, therefore, that arose in the case of the Thirty Hogsheads of Sugar v. Boile,[] and which was solved by Chief Justice Marshall, and related to the case of a foreign conquest, cannot arise in this case. The Chief Justice observed, "Some doubt has been suggested whether Santa Cruz, while in possession of Great Britain, could properly be considered a British *159 island. But for this doubt there can be no foundation. Although acquisitions made during war are not considered permanent until confirmed by treaty; yet, to every commercial and belligerent purpose they are considered as part of the domain of the conqueror, so long as he retains the possession and government of them. The Island of Santa Cruz, after the capitulation, remained a British island until it was restored to Denmark." Now, as we have seen, it is not necessary to invoke this doctrine in a case where the capture is of territory previously belonging to the sovereign power acquiring it, and which is retaken and held under the organic law and authority of that power.
I have said, that the cessation of the blockade in question resulted from the capture and repossession of the port and town of New Orleans, and that there was no longer an enemy's port or town to be blockaded. In addition to this, the moment the capture took place, and the authority of the United States was established, the municipal laws of that government took the place of the international law upon which the blockade rested. The reason for its continuance no longer existed: it had accomplished its object as one of the coercive measures against the enemy to compel a surrender. So far as intercourse with the town became material, whether commercial or otherwise, after the capture and possession, it was subject to regulation by the municipal laws, and which is much more efficient and absolute and less expensive than the measure of blockade. It is true, these laws cannot operate extra-territorially; but within the limit of the jurisdiction, and which extends to a marine league from the coast, their control over all intercourse with the port or town is complete. Seizures of neutral vessels and cargo on the high seas are, indeed, not admissible, but blockades are not established for the purpose of these seizures; they are but incidental to the exercise of the belligerent right against the port of the enemy.
The proclamation of the President of the 12th of May, 1862, which announces that the blockade of the port of New Orleans shall cease after the 1st of June following, has been *160 referred to as evidence of its continuance to that period. But I think it will be difficult to maintain the position upon any principle of international law, that the belligerent may continue a blockading force at the port after it has not only ceased to be an enemy's, but has become a port of its own. It is not necessary that the belligerent should give notice of the capture of the town, in order to put in operation the municipal laws of the place against neutrals. The act is a public event of which foreign nations are bound to take notice, and conform their intercourse to the local laws. The same principle applies to the blockade, and the effect of the capture of the port upon it. The event is public and notorious, and the effect and consequences of the change in the state of war upon the blockading force well understood.
I have felt it a duty to state the grounds of my dissent in this case, not on account of the amount of property involved, though that is considerable, or from any particular interests connected with the case, but from a conviction that there is a tendency, on the part of the belligerent, to press the right of blockade beyond its proper limits, and thereby unwittingly aid in the establishment of rules that are often found inconvenient, and felt as a hardship, when, in the course of events, the belligerent has become a neutral. I think the application of the law of blockade, in the present case, is a step in that direction, and am, therefore, unwilling to give it my concurrence.
[See infra, p. 258, The Venice; a case, in some senses, suppletory or complemental to the present one.]
NOTES
[*] The Betsey, Goodhue, Master, 1 Robinson, 282; The Neptune, 1 Id. 144.
[*] Yeaton v. Fry, 5 Cranch, 335; 1 Kent's Commentaries, 150; The Frederick Molke, 1 Robinson, 72; The Columbia. 1 Id. 130; The Neptune, 2 Id. 94.
[*] 6 Robinson, 390, n.
[*] 6 Robinson, 387.
[] 5 Id. 251.
[] 9 Cranch, 191.